UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



NANCY LANGE,

                Plaintiff,

  -v-

THE DEPARTMENT OF EDUCATION OF
THE CITY OF NEW YORK,

                Defendant.

No. 17-cv-3443 (RJS)
OPINION & ORDER

RICHARD J. SULLIVAN, District Judge:

Plaintiff Nancy Lange brings this action against her former employer, the New York City

Department of Education (the "DOE"), alleging that she was illegally fired in retaliation for

advocating on behalf of disabled students in violation of the Rehabilitation Act, 29 U.S.C. § 504,

*et seq.* (Doc. No. 6 ("Amended Complaint" or "Am. Compl.").) Now before the Court is the

DOE's motion for summary judgment. (Doc. No. 27.) For the reasons set forth below, that motion

is GRANTED.

I. BACKGROUND

A. Facts[1]

In January 2015, Lange was hired by the DOE, on a probationary basis, to work as a special

education teacher at P.S. 66. (Doc. No. 28 ¶ 1.) She was initially hired to instruct students, in

---

[1] In resolving this motion, the Court has considered the DOE's Local Civil Rule 56.1 statement (Doc. No. 28), Lange's counterstatement (Doc. No. 36), the declarations submitted in support of and in opposition to the motion and the exhibits attached thereto (Doc. Nos. 30, 38, 40), the DOE's memorandum of law in support of their motion (Doc. No. 29), Lange's memorandum of law in opposition to the DOE's motion (Doc. No. 37), and the DOE's reply memorandum of law (Doc. No. 39). Unless otherwise noted, where only one party's 56.1 statement or counterstatement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact.

small group settings, in literacy and mathematics. (Doc. No. 30-3 at 12.) Soon thereafter – in or around February 2015 – Lange transitioned to a different position at P.S. 66, which centered on working with special needs students subject to Individualized Education Plans ("IEPs"). (Doc. No. 28 ¶¶ 3–4.) In this role, she was responsible for coordinating various aspects of special education for the entire school, including handling paperwork, tracking meetings, and conferring with parents. (Doc. 30-1 at 58–59.) Then, in April 2015, Lange was reassigned to work as a special needs teacher in an Integrated Collaborative Teaching ("ICT") classroom. (Doc. No. 36 ¶ 5.) An ICT class contains both general education and special needs students, and has two teachers – a general education instructor and a special needs instructor. (*Id.* ¶ 6.)

On June 5, 2015, while walking the second grade students in her ICT class to the gymnasium for dismissal, Lange lost one of her students. (*Id.* ¶¶ 14, 16; Doc. No. 30-6.) In fact, Lange only realized the student had disappeared when one of the missing student's sisters asked Lange where her brother was. (Doc. No. 30-2 at 140.) Lange told the sister that "he was just here" and "started looking around the gym" for the missing student. (*Id.*) Lange then contacted Assistant Principal Stacy Adams ("Adams") to let her know that a student was missing; Adams then made an announcement over the school PA system. (*Id.* at 142.) The missing student's two sisters, who appeared "very upset," confronted Lange and exclaimed that she "lost my brother, you lost my brother." (*Id.* at 148.) Lange, at Adams's direction, called the boy's parents to inform them that their child had gone missing. (Doc. No. 37 at 8.) The police were also called and showed up at the school. (Doc. No. 30-2 at 148.) It was ultimately determined that, unbeknownst to Lange, the missing second grader had exited the school by himself and walked directly to his daycare provider. (Doc. No. 30-5.) Later that same day, Lange was asked to fill out an incident report, in which she wrote that she thought the student "went to the back of the line" while walking to the

gymnasium. (*Id.*) On June 23, 2015, Lange and her union representative met with Adams to discuss the incident. (Doc. No. 30-6 at 2.) On July 29, 2015, Adams issued Lange a formal reprimand, stating that she "engaged in professional misconduct and neglect of duty by failing to adequately supervise [the missing] student." (*Id.* at 3.)

Five days after the missing-student incident, Adams formally observed Lange in the classroom and rated her performance as unsatisfactory. (Doc. No. 30-7.) Adams's report noted that Lange had assigned a book with a "reading level" of "I," and because "[s]ixteen students in [her] class read below level 'I,'" not one student in the class was able to complete the reading assignment. (*Id.* at 2.) Adams also noted that "5–8 students were off task and not following directions." (*Id.* at 3.) The principal of the school, Thomas DeGrazia ("DeGrazia"), conducted an informal observation two weeks later and also graded Lange unsatisfactory. (Doc. No. 30-8.) DeGrazia noted that when he walked in, several students had their "heads . . . on the desk," and the room was dark with no lights. (*Id.* at 2.) Students were "talking to each other or napping" during the first third of the class period. (*Id.* at 2–3.) DeGrazia also wrote that Lange "treated [students] as outsiders" and did not engage with the students to assess whether they understood the subject matter being taught. (*Id.*) In her final end-of-year performance evaluation, dated July 9, 2015, Lange received another unsatisfactory rating from DeGrazia, who noted that she "fail[ed] to supervise a child effectively," and did not "[c]ontrol . . . class," plan or prepare work, or use effective teaching methods. (Doc. No. 30-9.) The report also described that she "spoke rudely" to another teacher. (*Id.*)

Thereafter, DeGrazia recommended to his supervisor, Superintendent Rafaela Espinal ("Espinal"), that Lange's probationary employment be discontinued. (Doc. No. 28 ¶ 42.) Lange then received a letter, dated August 7, 2015, informing her that "on September 8, 2015, [Espinal]

[would] review and consider whether [Lange's] services as a probationer [should] be discontinued." (*Id.* ¶ 48.) The letter also attached supporting documentation, including (1) Adams' report regarding her formal observation of Lange's class, (2) Adams' report regarding the missing student, (3) DeGrazia's report on his informal observation of her class, and (4) DeGrazia's year-end performance evaluation. (*Id* ¶ 49.) Lange submitted a written response on August 28, 2015. (Doc. No. 30-12.) On September 8, 2015, Espinal terminated Lange's probationary employment in a cursory one-sentence letter. (Doc. No. 30-13.)

Lange appealed her termination and her end-of-year performance rating of "unsatisfactory" to the DOE's Office of Appeals and Review ("OAR"). (Doc. No. 28 ¶ 52.) After OAR held a hearing, Espinal reviewed the materials from the hearing and reaffirmed Lange's dismissal, offering no reasons and making no findings. (Doc. No. 30-15.)

### B. Procedural History

On April 14, 2017, Lange commenced this action by filing a lawsuit in New York State Supreme Court, New York County. (Doc. No. 1.) The DOE removed the case to this Court shortly thereafter (*id.*), and Lange subsequently filed the operative Amended Complaint on June 8, 2017. In her Amended Complaint, Lange alleges that the DOE violated the Rehabilitation Act ("RHA"), 29 U.S.C. § 504, *et seq.*, because they fired her for "advocat[ing] on behalf of disabled, [s]pecial [e]ducation students." (Am. Compl. ¶ 38.) Following the completion of discovery, the DOE moved for summary judgment on January 26, 2018 (Doc. No. 27), and the motion was fully briefed on April 2, 2018 (Doc. No. 39).

### II. LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party "'show[s]' – that is, point[s] out . . . – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

III. DISCUSSION

The RHA provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability . . . be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Federal law prohibits "retaliation for opposing any practice made unlawful by . . . the Rehabilitation Act." 29 C.F.R. § 1614.101(b).

Retaliation claims under the RHA are governed by the three-step burden-shifting framework originally set forth in the context of Title VII discrimination claims in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48–49 (2d Cir. 2002) (analyzing RHA claims under the *McDonnell Douglas* framework). Under this burden-shifting approach, Lange must first make out a prima facie case of retaliation by showing that (1) she engaged in activity protected by the RHA; (2) the DOE was aware of this activity; (3) the DOE took adverse action against her; and (4) a causal connection exists between the adverse action and the protected activity. *See Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). Once a prima facie case is established, "the burden shifts to the defendant to proffer some legitimate, nondiscriminatory reason for the adverse decision or action." *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 767 (2d Cir. 2002). If the defendant proffers such a reason, the burden shifts back to the plaintiff to prove that the "legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination." *Id.*

A. Legitimate, Non-Discriminatory Reason

Notwithstanding her negative evaluations and the incident with the missing student, Lange contends that she was terminated in retaliation for complaining that special education students in

her ICT class were receiving 15 hours, not 20 hours, of special needs instruction per week (Doc. No. 37 at 7); that, on March 20, 2015, there was insufficient staff to safely escort the special needs students to their buses (*id*. at 5); and that there was no general education teacher in her ICT classroom on June 5, 2015 (*id*. at 6). But even if Lange could demonstrate a prima facie case of retaliation – which the Court assumes without deciding – the DOE has sufficiently stated a legitimate, nondiscriminatory reason for her termination.[2]

As DeGrazia testified, Lange's probationary employment was discontinued in part because she was rated as "unsatisfactory . . . due to her work as an instructor, as a teacher in the classroom." (Doc. No. 30-4 at 199.) DeGrazia also cited the "safety issue with [Lange] losing the child" as a reason for his recommendation that Lange be terminated. (*Id*.) DeGrazia explained that because his "primary focus was the safety of the children and their education," he believed that dismissal was appropriate. (*Id*. at 201.)

DeGrazia's account is supported by relevant documentation. For starters, the DOE produced an "[i]ncident report," signed by Lange, stating that when "walking down the stairwell to the gym for dismissal . . . [the second grade student] left the line and went to the daycare provider unbeknownst to the teacher." (Doc. 30-5 at 2.) The record also includes a formal letter, written by Adams and signed by Lange, reminding her that "it is your obligation to supervise all students under your care closely at all times to ensure safety regardless of what part of the student line they are walking [in] to dismissal." (Doc. No. 30-6 at 2.) And a second letter, dated July 29, 2015,

---

[2] The only adverse employment action identified by Lange is the termination of her probationary employment. (Doc. No. 37 at 1, 17.) While the Amended Complaint refers to Lange being "retaliated against" in a variety of other ways (Am. Compl. ¶ 31), she does not proffer any evidence that these purported instances of retaliation were "sufficiently severe . . . to permit a trier of fact to conclude that 'a reasonable employee would have found the challenged action materially adverse.'" *Sulehria v. City of New York*, 670 F. Supp. 2d 288, 314 (S.D.N.Y. 2009) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Accordingly, to the extent these instances of retaliation are alleged to be freestanding adverse actions, those claims are dismissed.

noted that Lange's failure to supervise amounted to "professional misconduct and neglect of duty." (*Id.* at 3.)

Similar documentation supports DeGrazia's contention that Lange's classroom performance was subpar. After informally observing Lange's class, DeGrazia wrote that he observed some students "whose heads were on the desk" and others who were "napping." (Doc. No. 30-8.) Unsurprisingly, this earned Lange a rating of unsatisfactory. (*Id.*) So too for the formal observation: There, Adams noted that "5-8 students were off task and not following directions," earning Lange another unsatisfactory mark. (Doc. No. 30-7.)

Taken together, the two proffered reasons asserted by the DOE for Lange's firing – her inadequate teaching and her losing track of a second grade student during dismissal – certainly constitute "legitimate, non-retaliatory" explanations for the termination. *Treglia*, 313 F.3d at 721.

### B. Pretext

As a result of the evidence put forth by the DOE, the burden shifts back to Lange to produce "sufficient evidence of pretext," *id.*, so that a reasonable factfinder could conclude that DOE's stated reasons were not the real impetus for Lange's termination. *Monachino v. Bair*, 769 F. Supp. 2d 431, 439 (S.D.N.Y. 2011). As such, Lange must produce "not simply *some* evidence," but rather "*sufficient* evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (alteration in original) (emphasis added) (internal quotations omitted).

Lange testified that she complained about safety issues regarding special needs students' busing on March 20, 2015, and about the amount of instruction hours that special needs students were receiving on or about April 13, 2015. (Doc. No. 38-1 at 95, 126.) While these two complaints predate the missing student incident and the negative performance evaluations, which occurred in

June and July 2015, Lange does not meet her burden to show that a reasonable factfinder could view these complaints – and not the legitimate explanations offered by the DOE – as the actual reasons for her dismissal. That is, Lange produces no affirmative evidence to suggest a connection between her complaints and her termination. Indeed, Adams testified – and Lange does not dispute (*see* Doc. No. 38-1 at 105–06) – that the problems with Lange's teaching began *before* she was placed in the ICT classroom, and therefore before she complained about students' instruction hours. Adams stated that Lange was moved to an ICT position because she "had difficulty completing all the duties of an IEP teacher." (Doc. No. 30-3 at 68.) DeGrazia's deposition reflects the same concern. According to him, Lange was "[i]neffective" in the IEP role and was "struggling meeting the job's criteria." (Doc. No. 30-4 at 109.) Thus, Lange's argument that her complaint about students' instruction hours – made on or around April 13, 2015 – was the true reason for her dismissal ignores the fact that questions about her job performance were already being raised prior to April 13, 2015. *See Weinstock*, 224 F.3d at 45 ("The consistency of the viewpoint expressed by [supervisor] – that [plaintiff's] research was subpar – . . . further supports Columbia's proffered nondiscriminatory reason for denying [plaintiff] tenure."); *see also Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 71 (2d Cir. 2015) (plaintiff could not demonstrate pretext because "[n]ot only did [supervisors] develop these opinions about [plaintiff's] conduct before [the protected activity], they also maintained a consistent perspective afterwards.").

Lange also contends that DeGrazia's year-end, in-class evaluations were "useless and with no pedagogical value." (Doc. No. 37 at 19.) Therefore, according to Lange, these evaluations "had no other value than to [be] use[d] as tools to retaliate against Plaintiff for her complaints." (*Id.*) Lange also points to a hodgepodge of statements from a former P.S. 66 teacher, Tenisha Gill, who noted that DeGrazia exhibited favoritism among teachers, and that "you were not a preferred

teacher if you complain[ed]." (*Id.* at 20.) Lange points to Gill because, evidently, Gill also felt that DeGrazia "gave more opportunity to the preferred teachers than the nonpreferred teachers." (*Id.* at 21.) But none of these assertions suggest that the DOE's legitimate reasons for terminating Lange – her subpar performance evaluations, and the fact that she lost a student – were mere pretexts for impermissible retaliation.

Lange also asserts that the in-class evaluations were a sham because they were conducted so late in the school year that "there was no opportunity for her to grow"; in Lange's words, the DOE was "actively setting [her] up for termination by papering her files with biased evaluations." (Doc. No. 37 at 19.) But Adams testified that the only reason these evaluations occurred in June was because Lange had only begun teaching in the ICT classroom in April. Thus, these evaluations were tailored to "give her ample time" to "get used to everything in the classroom." (Doc. No. 40-1 at 104.) Indeed, Lange stated in her own deposition that she *requested* that DeGrazia come to her classroom to observe her performance for a second time. (Doc. No. 30-2 at 176 ("I was like how can you assess me on one observation when I've done three different jobs here . . . . Is there something that we can do about it . . . and [then] Mr. DeGrazia decided that he was going to come and observe me.").) DeGrazia confirms as much. (Doc. No. 30-4 at 168 (stating the second observation was done "[a]t her request. I didn't have to do it.").)

And, importantly, this entire dispute must be viewed in light of the fact that Lange – who, it bears repeating, was a *probationary* employee – lost one of her students on June 5, 2015. DeGrazia testified that, in his judgment, the incident showcased a "fail[ure] to discharge her professional responsibilities" (Doc. No. 30-4 at 200), and demonstrated a disregard for a "primary focus" of the school – "safety of the children" (*id.* at 201). Lange has put forth no evidence suggesting that either DeGrazia is being misleading – i.e., that her termination had nothing to do

with losing a student on June 5, 2015 – or that the incident itself never happened. Indeed, to the latter point, Lange fully acknowledges that she lost a student that day and "did not know where [he] was." (Doc. No. 30-2 at 142.) There is also no suggestion that other, similarly situated probationary teachers – i.e., those who lost a student but did not advocate on behalf of disabled students – were treated more favorably than Lange. *See Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000) ("A showing that [a] similarly situated employee[ ] . . . received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext . . ."). In context, Lange's later complaint to her supervisors – that there was no general education instructor in her classroom on June 5, 2015 – more resembles an excuse for losing a second grader than an attempt to procure greater resources for her special needs students; as such, it does not support an inference of a pretextual firing.

In sum, Lange fails to demonstrate that it is "more likely than not the employer's decision was motivated, at least in part, by an intent to retaliate against h[er]." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (per curiam). Accordingly, given the ample record supporting Lange's termination, no reasonable factfinder could conclude that the legitimate, non-discriminatory reasons articulated by the DOE were pretextual, and that Lange was in fact fired for making complaints about the services offered to special needs students at P.S. 66.

## IV. Conclusion

For the reasons set forth herein, the DOE's motion for summary judgment is GRANTED. The Clerk of the Court is respectfully directed to terminate the motion pending at docket number 27, and to close this case.

SO ORDERED.

Dated:     September 26, 2018
           New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE